## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE APPLICATION OF ZOUZAR BOUKA;      )
VISION INDIAN OCEAN S.A.;      )
AND VIMA REAL ESTATE S.A.R.L.      )
FOR AN ORDER DIRECTING DISCOVERY FROM      )
SYMBION POWER SERVICES U.S., INC.;      )      Case No. 22 Misc. _____
SYMBION POWER LLC;      )
SYMBION POWER HOLDINGS LLC;      )
SYMBION POWER AFRICA, LLC;      )
SYMBION ENERGY HOLDINGS LTD.; AND      )
PAUL HINKS      )
PURSUANT TO 28 U.S.C. § 1782      )
_____)

## MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE* APPLICATION AND PETITION FOR AN ORDER TO CONDUCT DISCOVERY FOR USE IN A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782

STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 506-3909
Fax: (212) 506-3950
*Attorneys for Applicants*

March 24, 2022

## TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................... 1

II.  FACTUAL BACKGROUND ................................................................................ 5

A.   The Parties ....................................................................................................... 5

B.   Mr. Bouka Forms A Joint Venture with Symbion and Alpha to Rehabilitate the Mandroseza Power Plant ..................................................................................... 6

C.   Symbion Siphons Funds from the Plant to Fill the Pockets of Its U.S.-Based Subsidiaries. ........................................................................................................ 6

D.   The Malagasy Criminal Proceedings Against Hinks. ...................................... 8

E.   The Pending Arbitration Between VIO and Symbion ...................................... 9

F.   VIO's Planned Litigation Against Groupe Filatex. .......................................... 9

III. REQUESTED DISCOVERY ............................................................................... 11

IV.  ARGUMENT ....................................................................................................... 11

A.   Applicants Satisfy the Mandatory Elements of Section 1782. ....................... 12

    1.   Hinks and Symbion Reside or Are "Found" in the Southern District of New York .. 12

    2.   The Discovery Sought Is for Use in Foreign Proceedings ......................... 15

        i.   Applicants seek to use the discovery in the ongoing PAC proceeding ..................... 15

        ii.  Applicants seeks to use the discovery in contemplated French proceedings ............. 17

    3.   Applicants Are "Interested Persons" ......................................................... 18

B.   All of the Discretionary Factors of Section 1782 Weigh in Favor of Permitting the Discovery Applicants Seek. ............................................................................ 19

    1.   Discovery Is Unobtainable Absent Section 1782 Assistance. .................... 20

    2.   The Proceedings Are Fact-Intensive, Permit Evidence Provided by Foreign Courts, and the Court Would Be Receptive to U.S. Judicial Assistance .......................... 21

    3.   The Application Does Not Circumvent the Rules of Foreign Tribunals ................... 23

    4.   The Application Is Tailored to Avoid Unnecessary Burdens in Accordance with the Federal Rules of Civil Procedure ......................................................................... 24

V.   CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Accent Delight, Int'l*,
  869 F.3d 121 (2d Cir. 2017)..................................................................................16, 17, 18

*In re Al-Attabi*,
  No. 21-MC-207 (VSB), 2021 WL 4027021 (S.D.N.Y. Sept. 3, 2021) ...................................18

*In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery*
  *for Use in Foreign Proceedings*,
  773 F.3d 456 (2d Cir. 2014)..........................................................................................16

*Application of Malev Hungarian Airlines*, 964 F.2d 97 (2d Cir. 1992).........................................19

*In re Application of Johannes Roessner*,
  No. 21-mc-513 (RA) (OTW), 2021 WL 5042861 (S.D.N.Y. Oct. 29, 2021).........................21

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
  673 F.3d 76 (2d Cir. 2012)............................................................................................16

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)....................................................................................................14

*In re CBRE Glob. Invs. (NL) B.V.*,
  No. 20-MC-315 (VEC), 2021 WL 2894721 (S.D.N.Y. July 9, 2021)...................................20

*In re Consellior SAS*,
  2013 WL 5517925 (D. Conn. Oct. 2, 2013) .......................................................................20

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014)....................................................................................................15

*In re del Valle Ruiz*,
  939 F.3d 520 (2d Cir. 2020)..................................................................................12, 14, 20

*In re Edelman*,
  295 F.3d 171 (2d Cir. 2002)........................................................................................13, 24

*Euromepa, S.A. v. R. Esmerian, Inc.*,
  51 F.3d 1095 (2d Cir. 1995)........................................................................................22, 23

*Gorsoan Ltd. v. Bullock*,
  652 F. App'x 7 (2d Cir. 2016) ........................................................................................21

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004) ......................................................................................... *passim*

*In re Kuwait Ports Authority*,
    No. 1:20-MC-00046-ALC, 2021 WL 5909999 (S.D.N.Y. Dec. 13, 2021) ......................14, 17

*In re Malkovich*,
    No. 15-cv-3906 (RJS), Doc. 11 (S.D.N.Y. May 28, 2015) ......................................................17

*Mees v. Buiter*,
    793 F.3d 291 (2d Cir. 2015) ......................................................................15, 17, 23, 24

*In re Metallgesellschaft AG*,
    121 F.3d 77 (2d Cir 1997) ......................................................................................23

*In re Microsoft Corp.*,
    428 F. Supp. 2d 188 (S.D.N.Y. 2006) .......................................................................21

*In re Noguer*,
    No. 18-MC-498 (JMF), 2019 WL 1034190 (S.D.N.Y. Mar. 5, 2019) ..................................16

*In re O'Keeffe*,
    650 F. App'x 83 (2d Cir. 2016) ...............................................................................20

*Pfaff v. Deutsche Bank AG*,
    No. 20 Misc. 25 (KPF), 2020 WL 3994824 (S.D.N.Y. July 15, 2020) ...............................14

*In re Polygon Global Partners LLP*,
    No. 21 Misc. 364 (ER), 2021 WL 2117397 (S.D.N.Y. May 25, 2021) ...............................16

*In re Porsche Automobil Holding SE*,
    No. 15-MC-417 (LAK), 2016 WL 702327 (S.D.N.Y. Feb. 18, 2016) ................................24

*Pott v. Icicle Seafoods, Inc*,
    945 F. Supp. 2d 1197 (W.D. Wash. 2013) ..................................................................16

*RSS Judgment Enforcement LLC v. Symbion Power Tanzania Ltd.*,
    No. 21-cv-4331 (LAK), 2021 WL 4777654 (S.D.N.Y. July 26, 2021) ...................................5

*In re Servicio Pan Americano de Proteccion*,
    354 F. Supp. 2d 269 (S.D.N.Y. 2004) .......................................................................21

*In re Tiberius Goup AG*,
    No. 19-mc-467 (VSB), 2020 WL 1140784 (S.D.N.Y. Mar. 6, 2020) ................................23

*In re Top Matrix Holdings Ltd.*,
    No. 18 Misc. 465 (ER), 2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) ................................20

**State Cases**

*Licci v. Lebanese Canadian Bank, SAL*,
  20 N.Y.3d 327 (2012) ...........................................................................................14

**Federal Statutes**

28 U.S.C. § 1782................................................................................ *passim*

**Rules**

Fed. R. Civ. P. 26.................................................................................................24

Fed. R. Civ. P. 30.................................................................................................11

# I.     INTRODUCTION

Through this Application, Malagasy entrepreneur and investor Zouzar Bouka and his companies, Vision Indian Ocean, S.A. ("VIO") and VIMA Real Estate S.A.R.L. ("VIMA") seek discovery in aid of pending and contemplated foreign proceedings arising out of Respondents' participation in a multi-million-dollar theft from the Mandroseza Power Plant (the "Plant"), a project designed to bring reliable electricity to Madagascar, and their subsequent sale of interests in the Plant contrary to their contractual obligations and Malagasy law. Applicants satisfy all of the requirements for an order under Section 1782 and the Application should be granted.

Mr. Bouka's investments focus on furthering Madagascar's economic development, building a new Madagascar and enhancing the quality of life of Malagasy residents. To that end, Applicants embarked on the restoration and rehabilitation of the Mandroseza Power Plant, which was intended to supply power to the city of Antananarivo and, when fully repaired, could supply 15% of Madagascar's electricity demand. In 2014, Mr. Bouka met with Paul Hinks, who headed the Symbion group of companies. Symbion had won multiple U.S. government contracts to rehabilitate electrical infrastructure in Iraq and Afghanistan, was a major participant in the Obama Administration's Power Africa initiative and therefore appeared to be the perfect partners to restore the Plant. The next year, VIMA (later succeeded by VIO) entered into a Joint Venture Agreement with Symbion Power LLC ("Symbion Power"). Under that agreement, the parties created a joint venture company, Symbion Power Mandroseza Mauritius Ltd. ("SMML") and its subsidiary, Symbion Power Mandroseza S.A.R.L. ("SPARL"). VIO is the beneficial owner of shares in SMML (Symbion has wrongfully refused to register VIO's shareholding) and the legal owner of shares SPARL. Two of the four *gérants* (statutory managers or directors) of SPARL are Mr. Bouka and Mr. Hinks; the other two *gérants* are Alexander Oppenheim and Eytan Stibbe, who are associated with another investor, Alpha Innovations Management Ltd. ("Alpha").

But all was not as it seemed. Symbion, it turned out, has a track record of misconduct. Applicants later learned that Symbion had been accused of ditching a Tanzanian power plant project and, facing court and arbitration claims from unpaid staff and suppliers, surreptitiously distributing the project's assets to other Symbion entities and entities affiliated with Mr. Hinks and Symbion's other principal, Lord Westbury. In an enforcement claim of an arbitral award, the Tribunal found that, as a contractor on a USAID-funded power plant project in Afghanistan, Symbion had exaggerated its costs and could not rely on its invoices as evidence of its entitlement to payment. Litigation both in this Court and in the New York and Delaware state courts describe a similar pattern of using the corporate form to avoid liabilities and defraud creditors.

True to form, shortly after the Madagascar Plant was capitalized, Symbion decided to loot it. Between March 2017 and February 2019, Symbion transferred approximately $5 million to other businesses, including Symbion Power Services US Inc. and Symbion Power Holdings LLC. Symbion kept these payments secret and did not include them in financial reports to VIO and other investors. These payments were only discovered when Symbion inadvertently sent the *real* financial reports to its co-investors. Caught, Hinks admitted that Symbion had been going through a tough period and had to take a "loan" from the Plant to pay, among other things, for rent on its office and other headquarters functions in New York. When his co-investors demanded that Symbion return the misappropriated funds, Symbion refused and instead told the Plant's principal customer it would withhold millions of dollars in payment while the dispute was pending in order to try to extort a settlement.

An examining magistrate (*juge d'instruction*) of Madagascar's anti-corruption court, the *Pôle Anti-Corruption* (PAC), has issued the equivalent of an indictment charging Hinks with

using his position as a *gérant* of SPARL in bad faith and contrary to the interests of SPARL to favor Symbion by transferring approximately $5 million of the Plant's funds. While the indictment is subject to appeal, if upheld, Hinks will be tried before the PAC's Correctional Tribunal. SPARL, of which Mr. Bouka is a *gérant*, is a civil party to the prosecution, and has the right to appear as a civil party at the trial in Madagascar's French-derived criminal procedure, and can supply additional evidence to the PAC's public prosecutor.

Applicants and Alpha initiated an arbitration proceeding to hold Symbion to account. That proceeding is ongoing, but Alpha and Symbion have since entered into a settlement agreement to Applicants' detriment. Symbion has attempted to further prejudice VIO's interests by selling interests in the Plant to a third party, Groupe Filatex. Symbion and Groupe Filatex hid the deal from VIO and have refused to recognize VIO's rights as a shareholder or to comply with the company's statutes or Malagasy corporate law regarding that sale. VIO has instructed French counsel to pursue proceedings in France against Groupe Filatex and other companies involved in that illegal sale, including two France-based companies.

Applicants thus brings this proceeding to seek documents and testimony regarding: (i) the embezzlement, the disposition of the embezzled funds, and the participation of Hinks and the Symbion-linked directors in the embezzlement; (ii) the settlement agreement between Symbion and Alpha, including the extent to which it purports to require their respective *gérants* in SPARL and directors in SMML to act against the interests of those companies and VIO or to dispose of interests or rights that Applicants claim; and (iii) any agreement to sell shares in or assets of SPARL or SMML, or otherwise transfer interests claimed by Applicants to third parties, including Groupe Filatex. All of this information is directly relevant to Applicants' contemplated proceeding in France, as well as the PAC criminal proceeding in Madagascar.

Applicants meet the statutory requirements under Section 1782. Mr. Bouka, VIO and VIMA are plainly interested persons in both the anticipated litigation in France and the pending PAC criminal proceeding. Symbion's headquarters are in the Chrysler Building and it thus resides in this District. Applicants understand that Symbion entities based elsewhere are managed at least in part from Symbion's headquarters, so it is likely that any relevant documents that they possess would be located in or accessible from this District. The challenged transactions were wire transfers of U.S. dollars, and thus would have, at a minimum, cleared through banks in this District. Mr. Hinks is believed to reside in this District on Gramercy Park South, or at the very least to visit that home often enough that he can be personally served with the proposed subpoenas in this District.

This Application also warrants a favorable exercise of this Court's discretion. Many of the Respondents are not participants in the PAC criminal proceeding and none of them are participants in the contemplated proceeding against Groupe Filatex; even as to Hinks, the PAC has a limited practical ability to obtain documents outside of Madagascar, and Hinks is far likelier to comply with an order to produce documents in New York, where he either lives or visits frequently. The documents sought are relevant to the foreign proceedings, and VIO and VIMA will have ample opportunity to submit them either directly or by supplying them to the Public Prosecutor. Neither U.S. nor Malagasy public policy or proof-gathering restrictions are implicated; Hinks of course retains his ability to take the Fifth where he would otherwise be entitled to do so. And the proposed subpoenas are reasonable in scope for a case involving a multi-million-dollar theft. The application should be granted.

## II.    FACTUAL BACKGROUND

### A.    The Parties

*Applicants* are Zouzar Bouka and his companies VIO and VIMA. Mr. Bouka is a Malagasy investor and entrepreneur, a citizen of France, and the founder and Chairman of Vision Madagascar, through which he has been actively involved in entrepreneurial business development on the island for over twenty years. Declaration of Zouzar Bouka ("Bouka Decl.") ¶¶ 1-2. A particular focus of Mr. Bouka's business efforts has been bringing economic development to Madagascar. *Id.* ¶ 2. VIO is a minority shareholder of SPARL and Mr. Bouka is a *gérant*, which is akin to a director and officer, of the company. *Id.* ¶ 3. VIO is also a minority shareholder of SMML, although Symbion has refused to register it as such and VIO is currently seeking relief in arbitration concerning that refusal. *Id.* ¶ 4.

*Symbion Power Services U.S., Inc.; Symbion Power LLC; Symbion Power Holdings LLC; Symbion Power Africa, LLC; and Symbion Energy Holdings Ltd.* each form part of the Symbion Group, a corporate group headquartered in the Chrysler Building in New York that is principally engaged in developing electrical infrastructure projects around the world. Declaration of Kimberly Gulino ("Gulino Decl.") Ex. 1. Respondent *Paul Hinks*, who lives on Gramercy Park South in New York, founded the Symbion Group in 2005 with Richard Bethell, 6th Baron Westbury. Gulino Decl. Exs. 2 & 13. Over the past sixteen years, it has developed or operated projects mainly in Sub-Saharan Africa and Asia, including in Iraq, Afghanistan, Tanzania, Rwanda, Kenya, and Madagascar. Gulino Decl. Ex. 1. Several of these projects have ended in litigation against the Symbion Group alleging mismanagement, embezzlement, and other misconduct. *See, e.g.*, Gulino Decl. Ex. 3 (D.C. Circuit opinion in *Venco Imtiaz Constr. Co. v. Symbion Power LLC*); Gulino Decl. Ex. 4 (July 26, 2021 order in *RSS Judgment Enforcement LLC v. Symbion Power Tanzania Ltd.*).

## B. Mr. Bouka Forms A Joint Venture with Symbion and Alpha to Rehabilitate the Mandroseza Power Plant.

In early 2014, Mr. Bouka met Hinks at the United States-Africa Leaders Summit to discuss potential investments in power projects in Madagascar, where large portions of the country lack reliable electricity. Bouka Decl. ¶ 5. At the time, Symbion appeared to be a reliable partner: it had won multiple U.S. government contracts to rehabilitate electrical infrastructure in Iraq and Afghanistan, was a major participant in the Obama Administration's Power Africa initiative. *Id.* ¶ 6 Thus, Mr. Bouka entered into a joint venture agreement with Symbion Power to rehabilitate and operate the Mandroseza Power Plant. Bouka Decl. Ex. 1. Symbion Power, on behalf of SPARL, then in the process of incorporation, signed an agreement with the Malagasy state-owned utility firm Jirama for a twenty-year concession starting in July 2015; once the incorporation was complete, the agreement was novated to SPARL. Bouka Decl. Ex. 2. Similarly, Mr. Bouka, as *gérant* of SPARL, entered into a Production Concession Agreement ("PCA") with Jirama and the Ministry of Energy and Hydrocarbons on April 20, 2016. Bouka Decl. Ex. 3.

In connection with Symbion's later efforts to seek additional capital, Alpha also invested in the project in 2016, and the parties signed a Shareholders' Agreement that provided for the incorporation of and the duties of the shareholders with respect to SMML as a holding company that would hold many (but not all) of the shares of SPARL. Bouka Decl. Ex. 4.

## C. Symbion Siphons Funds from the Plant to Fill the Pockets of Its U.S.-Based Subsidiaries.

As the rehabilitation of the plant got underway, Symbion was facing substantial financial difficulties as many different projects became embroiled in litigation, including allegations of submitting fraudulent invoices in Afghanistan on a USAID-funded project, engaging in

fraudulent transfers to try to escape its debts in Tanzania, and creating an entirely parallel corporate structure in Cyprus to avoid its debts. Gulino Decl., Exs. 3, 4, 5. Driven by that financial difficulty, Symbion sought to re-trade the deal it had struck, demanding that the monthly management fee provided for under the terms of the Shareholders' Agreement, be increased by five times from $20,000 to $100,000. Bouka Decl. ¶ 12. Symbion admitted that its request had nothing to do with the Project but rather related to financial problems due to poor performance at its other projects, including in Tanzania. *Id*. It specifically identified its headquarters in New York as in need of the funds. *Id*.

For more than a year, Symbion demanded it be paid more than it was contractually entitled to. Mr. Bouka and Alpha held firm and insisted that Symbion perform as agreed. *Id.*

In response, Symbion took matters into its own hands. It stole millions of dollars from SPARL under the guise of "loans" to Symbion entities, without authorization from the shareholders and in violation of Malagasy law. The theft emerged on April 28, 2019, when Symbion sent VIO and Alpha—possibly unintentionally—a spreadsheet that differed from prior financial reports. The first tab was titled "Summary" and showed that Symbion currently owed the Plant more than $4 million. Bouka Decl. Ex. 7 ("Symbion debt to Mandroseza (Shortfall) 4,172,801.53"). In addition, the report included a tab titled "Interco," which displayed invoice-level transfers of millions of dollars from the Plant to other entities associated with Symbion. Between March 2017 and February 2019, Symbion made thirty-two transfers of at least $100,000 each (amounting to a total of $4.8 million), generally in round number amounts, from the Plant to various other businesses they controlled, including Symbion Power Services and Symbion Holdings. Bouka Decl. *Id*. Symbion made these transfers from the accounts of the Plant's operating company, SPARL. Hinks admitted that the purpose of those transfers was to

support Symbion's headquarters function in New York, including paying rent on its offices at the Chrysler Building. Bouka Decl. ¶ 14.

Caught *in flagrante delicto*, Hinks admitted that Symbion was going through a difficult period and had no choice but to take a "loan" of $4 million from the Plant to pay for Symbion's overhead costs, which included the costs of its headquarters in New York. Bouka Decl. Ex. 8 (5/13/19 Minutes). He agreed to repay the monies that Symbion had taken with interest. *Id.* Ultimately, VIO, Alpha, and ESAH agreed to treat the $4 million debt as a "loan" with an interest rate of 7.5% with $2 million to be paid by the end of 2019. *Id.* Symbion, however, never repaid any of the outstanding "loan."

Worse still, the limited financial records VIO has access to suggest that Symbion's financial misconduct is wider-ranging. VIO has already identified nearly $6 million in unexplained transfers or charges which Symbion caused the Plant to make when it was in control. Bouka Decl. ¶ 16. The spreadsheet showed that the Plant owed roughly $3.7 million in taxes that were more than 90 days overdue, and roughly $1 million of those taxes were incurred as a result of Symbion's wrongful transfers of funds. Bouka Decl. Ex. 7.

### D.    The Malagasy Criminal Proceedings Against Hinks.

Armed with evidence of Symbion's theft, SPARL's non-Symbion *gérants*, including Mr. Bouka, turned to Malagasy authorities in an effort to recoup the funds stolen by Symbion. On March 5, 2020, SPARL, through its *gérants*, filed a criminal complaint with Madagascar's anti-corruption tribunal, that Pôle Anti-Corruption ("PAC"), against the two Symbion-appointed *gérants*, Hinks and the Plant's general manager. Bouka Decl. Ex. 10 (PAC Complaint). SPARL is thus a *partie civile* to the PAC proceeding. Declaration of Frederika Banks ("Banks Decl.") ¶ 6.

On June 30, 2021, the Fourth Chamber of Instruction of the PAC issued a judgment finding sufficient evidence to refer to trial the charges against Hinks. Banks Decl. Ex. 1 (PAC Judgment). Specifically, the PAC concluded that Hinks had unlawfully transferred funds out of SPARL in a manner he knew to be contrary to the best interests of the company. *Id.* Hinks has filed an appeal that is currently pending. Banks Decl. ¶ 15. Once the matter is remanded for trial, SPARL's *gérants* have the right to participate in proceedings and present evidence under Malagasy criminal procedure. Banks Decl. ¶ 18.

### E.     The Pending Arbitration Between VIO and Symbion

On February 10, 2020, Symbion brought a preemptive arbitration proceeding against Alpha and VIO; Alpha and VIO then asserted counterclaims against Symbion pursuant to the Shareholders' Agreement for breach of that Agreement. Late last year, Alpha and Symbion reached a settlement on undisclosed terms and Alpha exited the arbitration proceedings. VIO does not rely on those arbitration proceedings as a basis for this application. In any event, as explained below, the existence of a pending arbitration between VIO and Symbion does not preclude Applicants from seeking documents for separate court proceedings.

### F.     VIO's Planned Litigation Against Groupe Filatex.

In addition to participating in the ongoing criminal proceedings against Mr. Hinks, Applicants have engaged counsel in France to file litigation proceedings for Symbion's sale of interests in the Plant to the Groupe Filatex, following Symbion's settlement agreement on unknown terms with Alpha. Bouka Decl. ¶ 26. While public reports have not disclosed exactly how Groupe Filatex purports to own the Plant, Applicants understand that Symbion purported to transfer shares in SMML and/or SPARL, ignoring VIO's right of first refusal under both the Shareholders' Agreement, SMML's Constitution, and SPARL's Statutes. Applicants also

understand that Symbion, Alpha, and potentially Groupe Filatex, have agreed to take steps to facilitate such a transaction in violation of VIO's rights under the Shareholders' Agreement and the companies' governing documents and in order to favor the interests of Symbion over the interests of SMML and SPARL as companies.

Applicants sent Groupe Filatex and other potential purchasers a notice of its rights on December 10, 2021. Bouka Decl. ¶ 27. That notice quickly found itself in Symbion's hands. Applicants have not agreed to arbitrate any dispute with Groupe Filatex; it is not a party to the Shareholders' Agreement and, because its purported receipt of SMML shares was in violation of SMML's Constitution, it did not become a party to the more limited arbitration clause that applies to certain internal affairs claims there.

VIO's planned claims against Groupe Filatex will be brought in France, which has jurisdiction under Article 14 of the French Civil Code on account of Mr. Bouka being a citizen of France and Article 42 of the French Code of Civil Procedure based on the nationality of some of the defendants; under French law, if any defendant is domiciled in France, other defendants may be sued in France regardless of their own relationship with France. Declaration of Alexandre Malan ("Malan Decl.") ¶¶ 17-19. At least two planned defendants, Energiestro and Okan Partners, are domiciled in France and were involved in Groupe Filatex's purported acquisition from Symbion—Energiestro by selling a 41% stake in itself to Groupe Filatex as part of the same overall set of transactions as the purported acquisition of the Plant and Okan as advisors on the deal. *Id.* ¶ 18. The principal claim will be to declare the transaction was unlawful and void because it did not comply with contractual and statutory requirements. *Id.* ¶¶ 15-16. VIO has not received either Symbion's agreement with Groupe Filatex or Symbion's prior agreement with Alpha, which VIO understands was a prerequisite of the sale, and therefore brings this

proceeding to obtain access to those agreements in order to understand the exact details of how Groupe Filatex came to purportedly acquire the Plant.

## III.    REQUESTED DISCOVERY

Applicants seek discovery of certain targeted issues relevant to the Malagasy criminal proceeding and the related planned litigation to declare unlawful the Symbion-Groupe Filatex transaction.  In general, to support the PAC proceeding, Applicants seek records of funds transfers directly or indirectly to any Symbion Group entity or their principals, including traceable proceeds of the transfers and related communications.  To support the planned litigation in France to declare unlawful the Symbion-Groupe Filatex transaction, Applicants seek agreements with Alpha and Groupe Filatex, which governed or were designed to facilitate or permit the purported sale transaction and related documents and communications.  Applicants also seek a deposition of Mr. Hinks and Rule 30(b)(6) depositions of the corporate respondents.

## IV.    ARGUMENT

This Court should grant VIO's Application because (1) it meets the statutory criteria set forth in Section 1782 (i.e., the person from whom discovery is sought resides in the district to which the application is made, the discovery is for use in proceedings before a foreign tribunal and the applicant is an "interested person"); and (2) the discretionary factors established by controlling case law weigh substantially in its favor (e.g., whether (a) the target of discovery is a participant in the foreign proceedings, (b) the foreign tribunal is receptive to the use of the Requested Discovery, (c) the request is an attempt to circumvent foreign law, and (d) the request is unduly burdensome). Granting the Application will serve Section 1782's "twin aims of providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to [U.S.] courts." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 252 (2004) (internal quotations and citation omitted).

### A. Applicants Satisfy the Mandatory Elements of Section 1782.

Applicants satisfy the three statutory requirements of Section 1782: (1) Symbion and Hinks reside or are "found" in the district to which the application is made; (2) the requested information is "for use" in an ongoing criminal proceeding in Madagascar and in reasonably contemplated proceedings against Symbion, Groupe Filatex, Energiestro, and Okan Partners in France; and (3) Applicants are "interested person[s]" in those proceedings.

### 1. Hinks and Symbion Reside or Are "Found" in the Southern District of New York

Under Section 1782, the analysis of whether an individual or entity "resides" or is "found" within the district "extends to the limits of personal jurisdiction consistent with due process." *In re del Valle Ruiz*, 939 F.3d 520, 527 (2d Cir. 2020). Hinks is a British national who, for the last fifteen years, has listed his residence in various public filings, including under penalty of perjury, as 8 Gramercy Park South, Suite 3K, New York, New York 10003—an address that, among other things, makes him one of the privileged few with the right to a key to Gramercy Park.

Applicants expect that Hinks will, as he has done in the past, deny that he resides in New York. This Court has not in the past, and should not in this case, credit such denials. In a recent case before this Court, Hinks stated in an affidavit that he "resides within South Africa" and has "never been a resident of the state of New York or the United States." *See* Gulino Decl. Ex. 6. As Judge Lewis Kaplan remarked in the course of that proceeding, however, the accuracy of Hinks' statements is "concerning" given that "[i]n an earlier action, . . . he asserted, under penalties of perjury that he was a resident of New York" and a "[p]leading filed on his behalf in earlier actions also asserted that he was a New York resident." Gulino Decl. Ex. 4, *RSS*, 2021 WL 4777654, at *1 & n.7; *see also* Gulino Decl. Ex. 7 (Verified Complaint, *Kurtzman v. Dokoupil, et*

12

*al.*, Index No. 161149/2020 (N.Y. Sup. Ct. Dec. 22, 2020), listing "Plaintiffs' residence" as 8 Gramercy Park S. #3K, New York, NY 10003 as the basis for venue in New York County, and Hinks as residing in New York at the time of filing in December 2020); Gulino Decl. Ex. 8 (Amended Answer of Hinks, *Wilson v. Hinks*, No. 15-cv-00853 (D.N.M. Aug. 18, 2016), admitting Hinks is a citizen of the U.K. and resident of New York); Gulino Decl. Ex. 9, Declaration of Paul Hinks, *Pike Electric, LLC, et al. v. Symbion Power, LLC, et al.*, No. 3:12-cv-120 (W.D.N.C. Feb. 23, 2012) (sworn affidavit confirming he is "a resident of New York").

Even if Hinks would be credible in claiming not to reside at this address, it gives good reason to believe that he comes to New York often and thus that Applicants will be able to serve Hinks personally in this District, so Hinks is "found" in the Southern District of New York. *See In re Edelman*, 295 F.3d 171, 179-80 (2d Cir. 2002) (a natural person is "found" in this District if personally served with a subpoena within the district).

Likewise, Symbion is "found" in this District because (a) it maintains its principal place of business here, and (b) it is subject to this Court's specific personal jurisdiction. Symbion Power Services, Symbion Power, and Symbion Holdings all maintain a principal place of business of the Chrysler Building, 405 Lexington Avenue, 26th Floor, New York, New York 10174. Like Hinks, Symbion has listed its principal place of business as the Chrysler Building on various public filings in this Court and others. *See, e.g.*, Gulino Decl. Ex. 10, Mem. of Law in Support of Mot. to Dismiss, *RSS*, 1:21-cv-04331-LAK, ECF No. 46 (S.D.N.Y. Jun. 18, 2021) ("[Symbion] are four Delaware business entities with principal places of business in New York[.]"); Gulino Decl. Ex. 11, Def's Answer to Pl.'s Verified Am. Compl., *Matthews v. Symbion Power LLC*, Index No. 653331/2019 (N.Y. Sup. Ct. Mar. 6, 2020), at ¶¶ 5, 7 (admitting that Symbion Power's "principal office is in New York County"). And Symbion Power's website

lists its head office address as the Chrysler Building. *See* Gulino Decl. Ex. 12. The remaining

respondents' nature as subsidiaries of a New York-based company and VIO's experience of Mr.

Hinks' personal involvement in Symbion subsidiaries' major decisions makes it likely that, to the

extent that their parents claim they lack the practical ability to obtain their subsidiaries' records,

key documents relevant to the embezzlement.

In addition, this Court has specific personal jurisdiction over Symbion. When Symbion

had control over the Plant and its operating company, Symbion "purposefully directed [its]

activities at . . . the forum" and the discovery VIO seeks "proximately resulted from [Symbion's]

forum contacts," since the improper transfers were to pay for Symbion's New York headquarters

and were almost certainly cleared through New York banks. *In re del Valle Ruiz*, 939 F.3d at

527-30 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)); *see, e.g.*, *Pfaff v.

Deutsche Bank AG*, No. 20 Misc. 25 (KPF), 2020 WL 3994824, at *10 (S.D.N.Y. July 15, 2020)

(finding target of discovery's trading activity "occurred largely through COMEX, which operates

in New York," and thus provided a sufficient basis for the exercise of personal jurisdiction); *In

re Kuwait Ports Authority*, No. 1:20-MC-00046-ALC, 2021 WL 5909999, at * (S.D.N.Y. Dec.

13, 2021) ("E*Trade participated in a funds transfer through a New York bank account and

maintains two offices in Manhattan.  There is no doubt here that E*Trade has sufficient

minimum contacts with New York."). The New York Court of Appeals and courts in this district

have also repeatedly held that sophisticated parties wiring funds in U.S. dollars through the New

York banking system are doing business in and purposefully directing their activities at New

York and subject to jurisdiction here for matters related to those contacts. *E.g.*, *Licci v. Lebanese

Canadian Bank, SAL*, 20 N.Y.3d 327 (2012).

The discovery VIO seeks regarding Symbion's unlawful diversion of the Plant's funds is in the possession or control of the New York entities and its principals. Symbion's misconduct may have directly injured the Plant in Madagascar, but it originated from decisions made by and for the benefit of Symbion's headquarters function operated out of New York. Bouka Decl. ¶ 14. Indeed, the overhead that Symbion misappropriated funds to cover included rent owed on its offices in the Chrysler Building. *Id.* The documents in Symbion's possession, therefore, will likely include records demonstrating how the siphoned funds from the Plant were spent or invested in the New York entities. Moreover, in order to transfer funds from the Plant, it is likely that Symbion received wire transfers in U.S. dollars sent from the Plant that cleared through New York. Bouka Decl. Ex. 7.

Finally, there is no dispute that this Court's exercise of personal jurisdiction over Symbion would not offended "traditional notions of fair play and substantial justice." *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014). Indeed, when Symbion entered into the PPA and Shareholders' Agreement with VIO, Alpha, and ESAH, it selected New York as the arbitration seat. Bouka Decl. Ex. 4 § 12.2 (Shareholders' Agreement). Symbion should not be permitted to argue that its contacts with this District preclude the Court's exercise of jurisdiction when it already consented to the possibility of litigation in the same forum. Thus, Symbion is "found" in the Southern District of New York,.

## 2. The Discovery Sought Is for Use in Foreign Proceedings

### i. *Applicants seek to use the discovery in the ongoing PAC proceeding*

To satisfy the "for use" requirement, an applicant must demonstrate that the discovery it seeks "will be employed with some advantage or serve some use in the proceeding—not necessarily something without which the applicant could not prevail." *Mees v. Buiter*, 793 F.3d

291, 298 (2d Cir. 2015); *In re Polygon Global Partners LLP*, No. 21 Misc. 364 (ER), 2021 WL 2117397, at \*6 (S.D.N.Y. May 25, 2021) ("[C]ourts focus on the '*practical ability* of an applicant to place a beneficial document—or the information it contains—before a foreign tribunal." (quoting *In re Accent Delight, Int'l*, 869 F.3d 121, 131 (2d Cir. 2017))). Indeed, the material need not be admissible in the foreign proceeding to satisfy the "for use" requirement. *Polygon*, 2021 WL 2117397, at \*6 (citing *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012)).

Criminal proceedings before a foreign criminal court plainly fall within the scope of Section 1782. *See Intel*, 542 U.S. at 257 (holding that it is "[b]eyond question" that conventional courts of first instance "qualify as tribunals"); *see also In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proceedings*, 773 F.3d 456, 462 (2d Cir. 2014) (finding that Swiss criminal investigation was "exactly the type of proceeding that the statute [was] intended to reach"). In *Pott v. Icicle Seafoods, Inc*, the court permitted the applicant's request for discovery for use in an ongoing criminal proceeding before an Argentinian appellate court. 945 F. Supp. 2d 1197, 1999-1200 (W.D. Wash. 2013). Although the Argentine trial court dismissed the applicant's claims and affirmed its ruling in two successive appeals, the "for use" requirement was satisfied because the applicant "ha[d] not exhausted his right of appeal." *Id.* at 1999; *cf. In re Noguer*, No. 18-MC-498 (JMF), 2019 WL 1034190, at \*3 (S.D.N.Y. Mar. 5, 2019) (noting that the Section 1782 applicant provided sufficient evidence showing that it could "introduce the evidence they seek in the Andorran appellate proceedings").

Applicants plainly meet the "for use" requirement because they seek to use the discovery in an ongoing criminal proceeding. In Madagascar's French-derived criminal procedure, SPARL is a *partie civile* in the PAC proceedings, and Mr. Bouka, as SPARL's *gérant*, is a person

through whom SPARL acts in providing evidence on SPARL's behalf to the tribunal. Banks Decl. ¶ 18. One of the leading Second Circuit cases on Section 1782 affirmed the grant of Section 1782 assistance to a victim that had the ability to join criminal proceedings in Monaco and France as *parties civiles*. *Accent Delight*, 869 F.3d at 125. The Second Circuit held that the ability to submit evidence as a *partie civile* satisfied the requirements of the "for use" prong because a *partie civile* has "the practical ability to inject the requested information into a foreign proceeding." *Id.* at 132. Then-District Judge Sullivan granted a Section 1782 application from an alleged crime victim in aid of proceedings before a French *Tribunal Correctionnel* in *In re Malkovich*, No. 15-cv-3906 (RJS), Doc. 11 (S.D.N.Y. May 28, 2015). In Madagascar's similar system, the result is the same; whether or not it suffices to bring the evidence to the public prosecutor, Mr. Bouka can provide the evidence to the PAC's courts himself as a *gérant* of SPARL. Banks Decl. ¶¶ 4, 18.

> ii. *Applicants seeks to use the discovery in contemplated French proceedings*

Applicants also satisfy the second statutory criterion for the additional reason that they reasonably contemplate bringing civil proceedings in France against Symbion, Groupe Filatex, Energiestro, and Okan Partners for the wrongful acquisition of an interest in the Plant in violation of Applicants' rights under the Shareholders' Agreement and the relevant entities' governing documents. *Mees*, 793 F.3d at 301 (Section 1782's second statutory requirement is met if "the materials [the applicant] seeks are to be used at some stage of a foreign proceeding that was within reasonable contemplation at the time of the proceedings below"). There is no requirement that Applicants must first seek information from nor wait until its claims are pending before a foreign tribunal. *See Intel*, 542 U.S. at 259 (foreign proceeding need only "be within reasonable contemplation"); *In re Kuwait Ports Authority*, 2021 WL 5909999, at *8

(finding the applicant demonstrated that it took sufficient steps towards instituting proceedings by retaining counsel, beginning to prepare filings, setting forth a legal theory, and providing declarations of intent to initiate the proceedings). Nor does the existence of a pending arbitration between VIO and Symbion preclude Applicants from seeking documents for separate court proceedings. *Cf. Accent Delight*, 869 F.3d at 133 (rejecting argument that the potential additional use of documents in other proceedings precluded grant of Section 1782 relief in aid of foreign proceedings); *In re Al-Attabi*, No. 21-MC-207 (VSB), 2021 WL 4027021, at *2 (S.D.N.Y. Sept. 3, 2021) (potential additional use in non-adjudicative attachment proceeding did not bar Section 1782 relief).

Here, VIO has taken concrete steps toward bringing its action against Groupe Filatex, including sending a demand letter and instructing counsel in France to pursue its claims for Groupe Filatex's wrongful purported acquisition of interests in the Plant as Symbion attempted to frustrate VIO's attempts to hold it accountable for the theft. Groupe Filatex was on notice of VIO's interests, including as a result of the demand letter, and yet proceeded with a deal in violation of preemptive rights provisions of the Shareholders' Agreement, the SMML Constitution, and/or the SPARL Statutes. These claims are also outside the scope of the arbitration agreements that apply to disputes between shareholders, because VIO never agreed to arbitrate disputes with third parties who are not parties to the Shareholders' Agreement or who claim to have acquired shares in the Plant without complying with the procedures for share transfers under SMML's Constitution and/or the SPARL Statutes that were intended precisely to give VIO the ability to decide who it will partner with.

### 3. Applicants Are "Interested Persons"

Finally, Section 1782 requires applicants to show that they possess a reasonable interest in the foreign proceedings. The phrase "any interested person" is interpreted broadly and covers

those with the right to participate and submit evidence in foreign proceedings. *See Application of Malev Hungarian Airlines*, 964 F.2d 97, 101 (2d Cir. 1992) (observing that the phrase "any interested person" was included in Section 1782 "as part of the effort to liberalize the assistance provided by American courts to foreign and international tribunals"); *Intel*, 542 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the interested persons who may invoke [Section] 1782.").

Mr. Bouka satisfies the third statutory requirement. As explained above, Applicants may place evidence before the Malagasy court presiding over the ongoing criminal proceedings against Symbion. He is a *gérant*, or statutory manager, of SPARL, the partie civile in the prosecution, and thus can introduce evidence on its behalf. Banks Decl. ¶ 18. Indeed, he authorized SPARL's initial complaint to the PAC and has supervised SPARL's lawyer in the proceedings. Bouka Decl. ¶ 17.

Similarly, VIO will be the plaintiff in the contemplated civil proceedings in France against Symbion, Groupe Filatex, Energiestro, and Okan Partners, making it a prototypical example of an "interested person" under Section 1782. VIO thus also satisfies the third threshold requirement.

**B.    All of the Discretionary Factors of Section 1782 Weigh in Favor of Permitting the Discovery Applicants Seek.**

The discretionary factors set out by the Supreme Court in *Intel* also weigh in favor of granting the Application. These factors include:  (1) "whether the person from whom discovery is sought is a participant in the foreign proceeding"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of

a foreign country or the United States"; and (4) "whether the request is otherwise unduly intrusive or burdensome." *Intel*, 542 U.S. at 264-65; *see also In re del Valle Ruiz*, 939 F.3d at 533–34; *In re O'Keeffe*, 650 F. App'x 83, 85 (2d Cir. 2016).

### 1. Discovery Is Unobtainable Absent Section 1782 Assistance.

To start, other than Hinks, none of the persons from whom discovery is sought are or would be participants in the foreign proceedings, which strongly supports discovery because "nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Intel*, 542 U.S. at 264; *see also In re Consellior SAS*, 2013 WL 5517925, at *2 (D. Conn. Oct. 2, 2013) ("Respondents are not parties to the action in France and therefore, the French Court cannot order them to produce discovery."). That there are affiliations between Hinks and the Symbion entities does not make them participants. *See, e.g.*, *In re Top Matrix Holdings Ltd.*, No. 18 Misc. 465 (ER), 2020 WL 248716, at *5 (S.D.N.Y. Jan. 16, 2020) ("Parent companies who are 'participants' to foreign proceedings are considered separate legal entities from their subsidiaries and affiliates for the purpose of Section 1782 motions."); *In re CBRE Glob. Invs. (NL) B.V.*, No. 20-MC-315 (VEC), 2021 WL 2894721, at *10 (S.D.N.Y. July 9, 2021) ("[H]ere, the information CBRE seeks from HBC US . . . is not information that an affiliate or subsidiary would have *solely* by virtue of its relationship to the real party to the foreign proceedings and is pertinent only to the party to the foreign proceeding."). For parties not before the Malagasy courts, Section 1782 assistance is the only realistic way to obtain their evidence for use in those proceedings. Third-party discovery does not exist under Madagascar's legal system, and even if Symbion were ordered to produce documents, it appears to no longer

have any assets there. Symbion's documents are available in this District for use in the foreign proceedings, and likely nowhere else.

And while Hinks is a participant, "participation in the foreign proceedings does not automatically foreclose [Section] 1782 aid." *Gorsoan Ltd. v. Bullock*, 652 F. App'x 7, 9 (2d Cir. 2016). Rather, the relevant inquiry is the "reach" of the foreign court—its practical ability to obtain the documents from the parties before it. *See, e.g.*, *In re Microsoft Corp.*, 428 F. Supp. 2d 188, 194 (S.D.N.Y. 2006) (finding nonparticipants' documents were nonetheless within the foreign tribunal's reach). Here, although Hinks is a party to the PAC proceedings in Madagascar, the PAC does not have the practical ability to enforce an order compelling production of documents in the possession and control of Symbion's New York-based entities. Hinks is not physically in Madagascar. By contrast, he resides or at the very least has substantial assets in this District, making this Court's practical ability to compel compliance far greater than the PAC's. In other words, the "evidence, available in the United States, [is] unobtainable absent [Section 1782(a)] aid." *Intel*, 542 U.S. at 264; *see also In re Servicio Pan Americano de Proteccion*, 354 F. Supp. 2d 269, 274 (S.D.N.Y. 2004) (finding that Section 1782 aid "may be necessary to enable discovery of the documents" even though the respondent was subject to the jurisdiction of the foreign court given "the apparent limitations of Venezuelan discovery rules").

Accordingly, for both the non-participant Symbion entities and for Hinks, the first *Intel* factor weighs strongly in favor of granting discovery.

### 2. The Proceedings Are Fact-Intensive, Permit Evidence Provided by Foreign Courts, and the Court Would Be Receptive to U.S. Judicial Assistance

The second *Intel* factor considers "the nature of the foreign tribunal, the character of the proceedings, and the receptiveness to U.S. federal court assistance." *In re Application of*

*Johannes Roessner*, No. 21-mc-513 (RA) (OTW), 2021 WL 5042861, at *3 (S.D.N.Y. Oct. 29, 2021). Courts considering a Section 1782 application presume that a foreign tribunal would be receptive to judicial assistance in the absence of "authoritative proof that a foreign tribunal would reject evidence" obtained thereunder."  *See id.* (quoting *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995) (holding that "[a]bsent specific directions to the contrary from a foreign forum, [Section 1782's] underlying policy should generally prompt district courts to provide some form of discovery assistance")).

In addition, the possibility that certain evidence may not be discoverable under a foreign tribunal's procedures does not affect the presumption that the foreign tribunal would welcome a U.S. district court's assistance pursuant to Section 1782. *See Intel*, 542 U.S. at 261 (a "foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts"). Nor do courts require "an extensive examination of foreign law regarding the existence and extent of discovery in the forum country . . . to ascertain the attitudes of foreign nations to outside discovery assistance." *Euromepa*, 51 F.3d at 1099.

Here, the nature and character of the proceeding before the PAC are well-tailored for Section 1782 aid. The criminal trial will turn on the facts of the misappropriation of funds. A civil case against Symbion and the Groupe Filatex likewise requires factual evidence, particularly related to the nature of its deal with Symbion and the knowledge it had of VIO's interests; nor is there any indication that Mauritius or French courts will not consider evidence obtained as a result of this Application. Thus, the second discretionary factor weighs in favor of granting the Application.

### 3. The Application Does Not Circumvent the Rules of Foreign Tribunals

The Application does not "attempt to circumvent" proof-gathering restrictions under foreign law. Accordingly, the third discretionary factor also weighs in favor of granting discovery. *Intel*, 542 U.S. at 264-65. For purposes of this inquiry, "[p]roof-gathering restrictions are best understood as rules akin to privileges that *prohibit* the acquisition or use of certain materials, rather than as rules that *fail to facilitate* investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information." *In re Tiberius Goup AG*, No. 19-mc-467 (VSB), 2020 WL 1140784 (S.D.N.Y. Mar. 6, 2020) (quoting *Mees*, 793 F.3d at 303 n.20). Indeed, there is no requirement to exhaust remedies in the foreign court first. *In re Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir 1997) ("[A] 'quasi-exhaustion requirement,' finds no support in the plain language of the statute and runs counter to its express purpose.").

Neither the PAC Rules nor the rules that will apply to VIO's contemplated civil proceedings prohibit the use of the evidence gathered abroad. Banks Decl. ¶ 20. Moreover, neither proceeding prohibits the use of the types of evidence sought through this application. *Id.*. If Symbion reasonably believes that any of the discovery sought presents concerns related to privilege, this Court may accommodate such concerns by, for example, issuing a protective order; it "need nor err on the side of completely withholding discovery assistance from international litigants." *Euromepa*, 51 F.3d at 1101.

Likewise, the Fifth Amendment right against self-incrimination poses no bar to the requested discovery. The corporate respondents do not have such a right, and, as for Hinks, Section 1782 expressly preserves his right to assert any applicable privilege, including the privilege against self-incrimination if it applies.

### 4. The Application Is Tailored to Avoid Unnecessary Burdens in Accordance with the Federal Rules of Civil Procedure

Finally, the fourth factor favors granting discovery because the Application is narrowly tailed to include only relevant, non-privileged information and avoid any undue burden on Symbion and Hinks. "[A] district court evaluating a § 1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure." *Mees*, 793 F.3d at 302 (citing *In re Edelman*, 295 F.3d at 179) ("Limits may be proscribed on [Section 1782] discovery or an existing order may be quashed under Rule 26(c)."))). Under a Section 1782 discovery order, relevance is defined as any information that "bears on, or reasonably could lead to other matter that could bear on" the Applicant's claims or defenses in the foreign action. *In re Porsche Automobil Holding SE*, No. 15-MC-417 (LAK), 2016 WL 702327, at *9 (S.D.N.Y. Feb. 18, 2016) (internal citations and quotation marks omitted).

As described above, the documents sought relate to narrow issues—Symbion's misappropriation of the Plant's funds to its New York-based operations, the disposition of those funds, any agreements between Symbion and Alpha or Symbion and Groupe Filatex that bear upon VIO's allegations that Groupe Filatex aided and abetted Symbion's efforts to ignore VIO's interests and rights, information regarding actual or potential sale transactions that violate VIO's rights, and information specifically regarding the Groupe Filatex sale. There is no reason to believe that complying with these requests would be unduly burdensome given the size of the theft and the likelihood that Symbion has already analyzed these documents in connection with other proceedings, but in any event, the subpoena recipients can meet and confer with the Applicants and seek appropriate relief from the Court if they object to the requests.

## V.    CONCLUSION

For the foregoing reasons, the Application should be granted.


Dated: March 24, 2022                    Respectfully submitted,


/s/ Robert W. Mockler_____
Robert W. Mockler
rmockler@steptoe.com
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York  10036-7703
Telephone:     212 506 3900
Facsimile:     212 506 3950