UNITED STATES DISTRICT COURT
SOUTHEN DISTRICT OF NEW YORK

| | |
|---|---|
| *IN RE APPLICATION OF ZOUZAR BOUKA;*<br>*VISION INDIAN OCEA S.A.; AND VIMA REAL*<br>*ESTATE S.A.R.L.*<br>*FOR AN ORDER DIRECTING DISCOVERY FROM*<br>*SYMBION POWER SERVICES U.S., INC.;*<br>*SYMBION POWER LLC;*<br>*SYMBION POWER HOLDINGS LLC;*<br>*SYMBION POWER AFRICA, LLC;*<br>*SYMBION ENERGY HOLDINGS LTD.; AND*<br>*PAUL HINKS*<br>*PURSUANT TO 28 U.S.C. § 1782* | Case No. 22 Misc. 00092-RA |

**DECLARATION OF PAUL HINKS**
**IN OPPOSITION TO APPLICATION FOR AN ORDER TO CONDUCT DISCOVERY**
**FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

PAUL HINKS, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury:

1.  I am the Chief Executive Officer of Symbion Power Holdings LLC, and its subsidiaries that are registered in the United States, ("Symbion"). Until February 14, 2022, I was a statutory manager of Symbion Power Mandroseza S.A.R.L. ("SPARL"). I submit this declaration in opposition to Zouzar Bouka's application for an order to conduct discovery for use in foreign proceedings.

**The Madagascar Plant Development**

2.  Symbion is a power development, construction, and operation company that works to create infrastructure and electricity to spur economic growth in the developing world. The majority of Symbion's work takes place in historically disadvantaged and developing countries.

3.  Symbion has successfully rehabilitated and operated power plants in highly unstable regions around the world, including eleven large-scale power projects in Iraq, three in

1

Afghanistan, four in Tanzania, two in Rwanda and one each in Nigeria, Kenya and Madagascar. Symbion companies have developed and invested in close to 1,400 megawatts of installed generation capacity in Africa. Symbion has been awarded numerous contracts by the United States Department of Defense and assisted in the early development of the Obama Administration's "Power Africa" initiative in 2013. Power Africa was launched by President Obama at a Symbion Power Plant in 2013.

4. Symbion continues today to invest in critical power projects with 33 new power plants under development in the Democratic Republic of Congo, as well as others in Kenya, Sierra Leone, Guinea, Angola, Zimbabwe and South Africa.

5. As part of its ongoing infrastructure investment business, in 2015, one of Symbion's related entities, SPARL, entered into an agreement with the government of Madagascar to rehabilitate the country's national power utility, the dilapidated Mandroseza Power Plant.

6. Although Zouzar Bouka seeks discovery from Symbion Power Services U.S., Inc., Symbion Power Holdings LLC, and Symbion Power Africa, LLC, none of these entities had any involvement in the transactions that gave rise to the current disputes.

7. To aid in the development of the plant and to procure additional investment projects, which Symbion had been negotiating with the government of Madagascar, Symbion included another company, VIMA Real Estate SARL ("VIMA"). VIMA is owned and managed by Zouzar Bouka. Mr. Bouka later replaced VIMA in the venture with Vision Indian Ocean SA ("V.I.O."). As consideration for V.I.O. participating in the project, V.I.O. was to assist Symbion in liaising with the locals and government agencies, and in developing more power projects in Madagascar.

8.      Symbion agreed to pay V.I.O. $1.2M as a success fee when the power plant became fully operational, and to allot a 5% free equity to V.I.O. in the project providing Bouka and VIO passed a simple "Know Your Customer" due diligence with local regulators, which they unfortunately did not. VIO was fully paid the $1.2M success fee.

9.      Ultimately, the 5% free shares were not allotted to V.I.O. because it did not meet the due diligence requirements of the Mauritius companies' regulator.

10.     In the end, V.I.O. did very little to nothing to assist Symbion with this massive undertaking and did not deliver on any of the other investments it had promised.

11.     To further facilitate the development of the Madagascar plant, Symbion entered into a series of agreements with Alpha Innovations Management, Ltd and its related company ESAH Power (collectively "Alpha") in May 2016. Alpha provided a significant investment to fund the project, while Symbion invested large sums of capital and committed to developing and managing the plant to bring electricity to the people of Antananarivo, Madagascar.

12.     The completion of the rehabilitation of Mandroseza Power Plant by the Symbion management team represented a marked improvement in the stability of the power supply in Antananarivo. The success of Symbion was hailed at a public inauguration event by Madagascar's Head of State, government Ministers, the US Ambassador to Madagascar and a Congressional Delegation from Washington DC.

***The New York Arbitration***

13.     Over the course of the power plant project, a financial dispute arose between Symbion, Alpha, and V.I.O., centered on the costs of running the plant and the appropriate payment to Symbion for its management services.

14. To resolve this dispute, Symbion initiated an arbitration action in New York City on February 10, 2020 with the International Centre for Dispute Resolution (the "ICDR Arbitration") at the American Arbitration Association (AAA), which was the venue for dispute resolution that was agreed in the Shareholders Agreement.

15. In retaliation, Alpha and V.I.O. both filed counter-claims against Symbion in the ICDR Arbitration. Claims that I considered to be totally spurious.

16. In the course of that arbitration, significant discovery took place and Symbion provided Alpha and V.I.O (i.e. Bouka) with thousands of documents in response to requests for documents regarding the management fees in dispute (the funds that Bouka now falsely claims were "embezzled"). This is the same discovery that Bouka and his companies now seek in this action. True and correct copies of the arbitrator's discovery rulings and the cover letters producing these documents are attached as **Exhibit A.**

17. Bouka provided minimal documentation to Symbion as part of discovery in the ICDR Arbitration.

18. After this voluminous discovery and disclosure on the part of Symbion and a less than transparent, limited disclosure by VIO and Alpha, Symbion and Alpha reached a settlement agreement and agreed to dismiss their claims against each other.

19. This settlement was negotiated by the principals of Symbion Energy Holdings, Richard Westbury and his partner Ted Kalborg and their company SAHOUN, and Eytan Stibbe of Alpha.

20. I was not directly involved in these negotiations but he was advised by Westbury and Kalborg that Stibbe had told them he was taking care of Bouka's interests in accordance with the general terms of the settlement agreement.

21. To my surprise, I was subsequently told that Bouka had refused to settle his claims in the arbitration, notwithstanding significant efforts to satisfy him

22. Following this settlement, I do not have any ownership interest in the Plant, nor does Symbion Power LLC. The only Symbion entity that has shares in the power plant is Symbion Energy Holdings Ltd—a company controlled by Richard Westbury and Ted Kalborg.

23. Ever since Symbion and Alpha reached their settlement agreement, Bouka has attempted to access the confidential settlement agreement and made unsupported accusations that the agreement has somehow prejudiced his rights.

24. First, Bouka attempted to obtain the Settlement Agreement document through the arbitration. Both Symbion and Bouka provided extensive briefing on whether Bouka should be able to access this confidential agreement. Alpha provided a more cursory submission, but agreed with Symbion on the record that this confidential settlement should not be provided to Bouka.

25. The arbitrator reviewed these submission and ruled that Bouka had not "demonstrated that the Requested Information is 'material and necessary' to its existing claims or defenses in the arbitration such that production of the Requested Information should be ordered at this stage." The arbitrator's decision rejecting Bouka's attempt to obtain the settlement agreement between Symbion and Alpha is attached as **Exhibit B**.

26. The arbitrator also denied Bouka's request for *in camera* review.

27. After the arbitrator denied his request, Bouka attempted to circumvent the arbitrator's ruling. On December 10, 2021, Bouka sent a letter to Group Filatex and other third-parties he believes are acquiring an ownership interest in the power plant as a result of Alpha and Symbion's settlement. In his letter, Bouka made defamatory accusations against Symbion,

threatened third-party entities with potential litigation, and demanded that he be provided with "*details of any term sheet, agreement (draft or final), or any other document that purports to deal with any interest in the Plant, SPARL and/or SMML.*" Attached as **Exhibit C** is a true and correct copy of the December 10, 2021 Letter (emphasis in the original). This extrajudicial attempt to obtain the confidential settlement the arbitrator denied to Bouka also failed.

28. Bouka's request to this Court for "agreements between Symbion and Alpha or Symbion and Groupe Filatex," ECF No. 2 at 24, is yet another attempt to sidestep the arbitrator and obtain the settlement agreement between Symbion and Alpha in the ICDR Arbitration, which remains pending.

***The Madagascar Criminal Proceedings***

29. Shortly after Symbion initiated the commercial arbitration against Alpha and V.I.O to resolve the fee dispute, Bouka filed a sham criminal complaint against me and other Symbion managers on April 2, 2020 in Madagascar's Pôle Anti-Corruption Court ("PAC"), claiming that the money Symbion had been paid to manage the power plant, including paying staff and paying for parts, (the same money in dispute in the New York arbitration initiated by Symbion) had been "embezzled."

30. While Buoka purported to file the PAC complaint on behalf of SPARL, Bouka did not have consent from *any* of the company's other directors or shareholders. He fabricated a malicious complaint shortly after Symbion filing its arbitration case in New York and he has used this – and he continues to use it – to smear me and create leverage for his outlandish demands.

31. The directors of SPARL's parent company have renounced the criminal proceeding in a letter which states that "For any such complaint to be filed in the name of, or on behalf of, our subsidiary company, the majority of the shareholders of SYMBION

6

MANDROSEZA MAURITIUS LIMITED" must approve such action." A true and correct copy of the director's letter to the PAC is attached as **Exhibit D**.

32. The letter from the directors of SPARL's parent company also states "We did not approve of the action that was unilaterally taken by Zouzar BOUKA. We do not deem such action to be in the benefit or need of SYMBION POWER MADORSEZA SARL. We hereby wish to withdraw from the complaint made in the name and on behalf of SYMBION POWER MADROSEZA SARL…" *Id.*

33. In addition, the remaining gerants of SPARL (the same position held by Bouka), have also signed a letter stating that they "contest[] the complaint lodged by Mr. Zouzar Bouka on behalf of [the company]," "declare to withdraw from said complaint," and that "in filling the complaint with [PAC], Mr. Zouzar BOUKA was not exercising any authority for the benefit or need of SYMBION POWER MADROSEZA SARL or its majority shareholders." This letter from SPARL's remaining gerants disavowing the criminal proceeding brought in the company's name is attached as **Exhibit E**.

34. The indictment is currently on appeal before the Court of Cassation at the Supreme Court of Madagascar.

35. No criminal proceedings will move forward, and no evidence will be accepted, until there is a ruling on that appeal.

***The Hotel Settlement***

36. In addition to the ICDR Arbitration, I and other shareholders of the Marovasa, a hotel property we owned in Madagascar, had a separate commercial dispute with Bouka. That dispute was litigated in London commercial court (the "Marovasa Dispute"). Once again the

7

dispute was initiated by me and three other shareholders because of Bouka's failure to comply with his financial obligations.

37. Although the Marovasa Dispute had no relationship to the allegations in Bouka's criminal complaint, Bouka effectively used his criminal complaint to extract a more favorable settlement in this unrelated civil litigation and he agreed that he would withdraw his spurious criminal complaint as a part of the settlement of the case in London.

38. As part of the settlement of the Marovosa Dispute, Bouka drafted and executed a letter to the PAC Court in which he withdrew his criminal complaint against me. This letter stated that Bouka wished to "withdraw [his] complaint," "waive all action against Paul Hinks," and ends by stating that "my decision is final." A true and correct copy of that letter is attached as **Exhibit F** (the "Criminal Letter").

39. Bouka conditioned his submission of the Criminal Letter to the Court, however, on his getting agreement from the other SPARL shareholders to withdraw the criminal complaint within 7 days, and the settlement was closed on that understanding. As described above, the SPARL shareholders did, in fact, state that they do not support the criminal complaint. But, when that did not happen within the seven-day time period specified, Bouka then declined to submit his letter, claiming that because he didn't get a response from the Alpha shareholders Eytan Stibbe and Alexander Oppenheim within seven days, he no longer is required to withdraw the complaint.

40. Currently, all shareholders in SPARL have signed averments disavowing the PAC proceeding, *see* **Exhibits D and E**. It is crystal clear that Bouka's criminal complaint is simply a malicious effort to cause me damage and create unfair leverage in his business dealings with credible partners.

Dated: April 22, 2022
New York, New York

                                                    PAUL HINKS